# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| Mary A. Gardner, | : | Case No. 5:07CV3876 |
| Plaintiff | : | Judge Peter C. Economus |
| v. | : | Magistrate Judge David S. Perelman |
| Commissioner of Social Security, | : | **REPORT AND RECOMMENDED DECISION** |
| Defendant | : | |

      This action brought under 42 U.S.C. §§405(g) and 1383(c)(3) has its origins in an application for disability insurance benefits, 42 U.S.C. §§416(i),423 filed September 25, 2002, alleging disability as of February 28, 2002.

      Upon denial of plaintiff's claims on the state agency level hearing de novo before an Administrative Law Judge (hereinafter ALJ) was requested. Evidentiary hearing, at which plaintiff was represented by counsel, was held on August 1, 2005 . Also testifying at that proceeding was a vocational expert.

      On September 19, 2005 the ALJ entered his decision finding the plaintiff not disabled, which became the defendant's final determination upon denial of review by the Appeals Council on February 15, 2006.

      On April 17, 2006 the plaintiff brought an action in this court seeking review of that denial (Case No. 5:06CV0910), and on October 27, 2006 a sentence four remand order was entered pursuant to stipulation of the parties.

Shortly before that action was instituted the plaintiff filed applications for DIB and for supplemental security income, 42 U.S.C. §1381 et seq.[1] Those claims were denied on the state agency level, and were escalated for consideration and resolution by an ALJ along with the remanded DIB claim.

On May 31, 2007 the matter came on for evidentiary hearing before a different ALJ than had conducted the prior proceeding. Also testifying at that hearing were a medical expert, Dr. Hershel Goren, and a vocational expert, Mr. Ted Macy.

When asked by the ALJ about her mental/emotional state the plaintiff testified as follows:

> Q. You say you have bipolar disorder and obsessive compulsive disorder.
>
> A. Yes.
>
> Q. How rapidly do you cycle in the bipolar disorder?
>
> A. Well, when I'm on my medication—then if I take my medication like I'm supposed to, I don't have a problem.
>
> Q. Okay. Do—what you just said leads to the next question. I gather that there is a problem sometimes with taking your medication.
>
> A. No, no that wasn't what I meant. As long as I'm on the medication I'm able to function.
>
> Q. Okay.
>
> A. I have more of a problem with depression.
>
> Q. Okay. Tell me about the depression.
>
> A. When I'm in depression I have days to where I can't get out of bed.

---

[1] Although the documentation pertinent to those applications carries the date of January 24, 2007 the applications were assigned a protective filing date of April 12, 2006. See, R. p. 436, 567.

2

>    Q. How many times a week would you have that?
>
>    A. Oh, it varies quite a bit.
>
>    Q. How much is quite a bit?
>
>    A. I don't know, three, four days a week.

The ALJ then turned to the subject of the plaintiff's physical problems, and she stated:

>    Q. Do you use supplemental oxygen when you're at home?
>
>    A. No, not now.
>
>    Q. Did you use to?
>
>    A. Yes, when I was discharged from the hospital.
>
>    Q. How many liters a minute were you on?
>
>    A. Three.
>
>    Q. How long were you on supplemental oxygen?
>
>    A. For a few months.  I was on it a few months constantly.  Then it went to just at night when I was sleeping, I had to wear it.

When the ALJ later inquired what was the heaviest thing she could lift the plaintiff responded:

>    A. I don't know.  I don't do any lifting.
>
>    Q. Can you lift a gallon of milk?
>
>    A. Yeah.
>
>    Q. In each hand?
>
>    A. Excuse me?
>
>    Q. In each hand.
>
>    A. In each hand?

> Q. A gallon of milk in each hand.
>
> A. But if I was to walk with it, I would be winded.
>
> Q. How far are you able to walk without getting winded?
>
> A. Not very far.
>
> Q. How far is that?
>
> A. Well, I can go from my bedroom to my bathroom which isn't very far. About a room's distance and I'm winded. Unless I'm on the higher dose of steroids.

When examined by her counsel the plaintiff testified regarding her use of her "breathing machine"

> Q. Okay. Then, then what you use a mask to put over your nose and mouth?
>
> A. No, I don't have the mask. It's a mouthpiece.
>
> Q. Mouthpiece. So how often—right now I know you're not working, but, but how often right now during an average day do you have to use the machine?
>
> A. During the day? About six to eight times.
>
> Q. Was there—is that more than you were using it say five years ago?
>
> A. Yes, a lot more.
>
> Q. Five years ago how many times a day did you use it back then? In other words around the time you quit working at the drug inspector job how often were you using the thing?
>
> A. Probably four to six times a day maybe as needed. There's times now I'll have to do it every couple hours.

On the subject of her use of steroidal medications the plaintiff testified:

> Q. How often are you using steroids, whatever the name may be?

A. Well, I just finished up a (INAUDIBLE) dose pack that he gave me because of my—I had chest cold, and it [took] two antibiotics to get rid of that, and I'm finishing up a (INAUDIBLE) dose pack. Then after that I'll probably be taking one or two a day as needed.

Q. The steroid medications?

A. Right.

Q. So in the course of say the average month do you, do you take steroids—how often? How often would you say over a month?

A. Frequently.

Q. Like how, how much is frequently? Is it every week, is it once a month, is it twice—well, we're trying to get an idea of how frequently you're actually—

A. Just about every day. Dr. Reed said to try and take it every other day. If I don't take it every day, I can't function at all. Like to take a shower, I have to take—I usually take about two of them.

Q. So how long have you been taking them either every day or every other day? How long, how long has this been going on? Roughly. I mean I just—months?

A. The frequency like that?

Q. Yeah, every day, every other day, how long has this been? Has it been a matter of months, weeks, a year?

A. About a year, year and a half.

Q. Is this more frequent use of the steroids than say five years ago when you quit working?

A. Yes.

Q. Were you taking them back at that time?

A. Not on a regular basis.

Q. But you were taking them on occasion back at that time?

    A.   On occasion, yes.

On June 28, 2007 the ALJ entered his opinion denying plaintiff's claims. That decision became defendant's final determination upon denial of review by the Appeals Council on October 25, 2007. This action was then filed seeking review of that final determination.

The ALJ's Findings of Fact and Conclusions of Law were:

1. The claimant met the disability insured status requirements of the Social Security Act on February 28, 2002, her alleged onset date of disability, and she continued to meet those requirements through at least the date of this decision (Exhibit 2D).

2. The claimant has not engaged in substantial gainful activity since February 28, 2002, her alleged onset date of disability (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: asthma; chronic obstructive pulmonary disease; bipolar disorder; panic disorder without agoraphobia; anxiety disorder, not otherwise specified; and, obsessive-compulsive disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the Court finds that the claimant has the physical residual functional capacity to lift and/or carry up to 20 pounds occasionally and 10 pounds frequently. She can sit for six hours, stand and/or walk for six out of eight hours. The claimant does not have any limitations in her abilities to push, pull and operate foot pedals. From the nonexertional standpoint, the claimant can occasionally climb ramps, stairs, use ladders, ropes or scaffolds. She can frequently balance, stoop, kneel, crouch and crawl. Claimant does not have any manipulative, visual or communication skill limitations. She should avoid temperature extremes, smoke, fumes and odors. She is unable to perform occupations requiring high production quotas or piece work. Moreover, she is limited to work that

>    requires only superficial interactions with supervisors, the public and coworkers and not be involved in any occupation requiring arbitration, confrontation or negotiation.
>
> 6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).
>
> 7. The claimant was born on August 14, 1959 and she is currently 47 years old, which is defined as a "younger individual." She has been in this age category at all times relevant to this decision (20 CFR 404.1563 and 416.963).
>
> 8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.963).
>
> 9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
>
> 10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).
>
> 11. The claimant has not been under a disability, as defined in the Social Security Act, from February 28, 2002 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

The standards which control on a review of this nature were summarized by the Sixth Circuit in Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984) as follows:

> Judicial review of the Secretary's decision is limited in scope to determining whether the findings of fact made by the Secretary are supported by substantial evidence and deciding whether the Secretary employed the proper legal criteria in reaching her conclusion, Walston v. Gardner, 381 F.2d 580, 585 (6th Cir. 1967). This Court may not try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility, Myers v. Richardson, 471 F.2d 1265 (6th Cir. 1972). Rather "[t]he

> findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive..." 42 U.S.C. §405(g).
>
> The Supreme Court has stated that "substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantiality of the evidence must be based upon the record taken as a whole. Allen v. Califano, 613 F.2d 139, 145 (6th Cir. 1980), citing Futernick v. Richardson, 484 F.2d 647 (6th Cir. 1973). "Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the `substantiality of evidence must take into account whatever in the record fairly detracts from its weight'." Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978), quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474 (1951). "We may not focus and base our decision entirely on a single piece of evidence, and disregard other pertinent evidence." Hephner v. Mathews, 574 F.2d 359, 362 (6th Cir. 1978).

In resolving the issue of whether the defendant's final determination is supported by substantial evidence the decision upon judicial review cannot turn upon whether the reviewing court agrees with the Secretary's determination. Indeed, the reviewing court may conclude that substantial evidence would support a final determination contrary to that arrived at by the defendant and yet be obliged to affirm the defendant's final determination. In Mullen v. Bowen, 800 F.2d 535, at 545 (6th Cir. 1986), the court cited with approval the following from Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984):

> The substantial-evidence standard allows considerable latitude to administrative decision makers. It presupposes that there is a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposition decision.

On this appeal the plaintiff presents the following issues:

    I.    PLAINTIFF WAS DENIED A FAIR HEARING WHERE THE

      ALJ RELIED ON THE TESTIMONY OF AN ME WHO RETIRED FROM THE PRACTICE OF MEDICINE ELEVEN YEARS BEFORE THE HEARING, WHO HAD NEVER TREATED ANY PATIENT FOR PULMONARY DISORDERS DURING HIS MEDICAL CAREER, AND WHO DID NOT KNOW BASIC PULMONARY MEDICINE PRINCIPLES INCLUDING THOSE PROMULGATED BY THE AMERICAN MEDICAL ASSOCIATION (AMA) GUIDES FOR THE EVALUATION OF PERMANENT IMPAIRMENTS.

II. THE ALJ AND THE COMMISSIONER APPLIED IMPROPER STANDARDS OF LAW BY FAILING TO ARTICULATE VALID REASONS FOR REJECTING THE OPINIONS OF THE TREATING SOURCE AND THE CONSULTING AND REVIEWING PHYSICIANS, AND FOR ADOPTING ONLY PART OF THE OPINION OF THE STATE DDS REVIEWING PHYSICIANS.  THE DECISION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

III. VIOLATION OF THE TREATING PHYSICIAN RULE.

IV. THE ALJ AND COMMISSIONER ERRED IN DENYING THE CLAIM BASED ON THE VE'S ANSWER TO A HYPOTHETICAL QUESTION THAT DID NOT CONTAIN ALL OF MS GARDNER'S IMPAIRMENTS.

V. PLAINTIFF SHOULD HAVE BEEN FOUND DISABLED BASED ON THE VE'S STATEMENT THAT A PERSON WHO HAS TO FREQUENTLY USE A NEBULIZER MACHINE AS NEEDED IS LIMITED TO SPECIAL ACCOMMODATED WORK.

     This Court finds the plaintiff's first claim of error to be devoid of merit, for the simple reason that in coming to his conclusion as to the plaintiff's residual functional capacity the ALJ did not rely on the testimony of Dr. Goren.  The only mention of Dr. Goren's testimony in the ALJ's decision, appearing in Finding Number Five setting out his determination as to the plaintiff's capabilities/limitations, is the passing comment "Further, the medical expert opined that claimant has environmental and mentally related nonexertional limitations."  That comment followed a


comprehensive review by the ALJ of the objective medical evidence probative of the plaintiff's subjective complaints and opinions expressed by the plaintiff's treating physician, Dr. William Reed, and those of a physician who performed a consultative examination in March 2003 and state agency medical consultants.

This being so, Dr. Goren's qualifications, or lack thereof, with regard to pulmonary disorders is of no consequence in assessing whether the ALJ's determination regarding the plaintiff's residual functional capacity is supported by substantial evidence.

Moving on to plaintiff's second claim of error, this Court is at a loss to understand counsel's reference to evidence originating with the physician who conducted the consultative examination in March 2008, Dr. Sundar Natarajan, and two state agency review physicians, Drs. Congbalay and Pangalangan, (along with that from Dr. Reed), as none of that evidence supports the plaintiff's claim of disability. Dr. Natarajan concluded that "[B]ased on my objective findings I believe this patients [sic] ability to do work related physical activities such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, traveling is <u>moderately impaired</u>. Specifically it seems as though her breathing may be exacerbated by lifting, carrying and handling objects on a repeated basis." (Emphasis added.) Under date of May 30, 2003 Dr. Congbalay completed a Physical Residual Functional Capacity Assessment form, and the determinations reflected therein would put the plaintiff at the light work level, as found by the ALJ. In September 2003 Dr. Pangalangan affirmed Dr. Congbalay's assessment.

This leads to consideration of the evidence originating with Dr. Reed which underlies plaintiff's third claim of error, alleged violation of the treating physician rule.

It is the rule in this circuit that the opinion of a treating physician is generally entitled to

substantial deference, and may, in given circumstances, even be entitled to complete deference. King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984).

Nevertheless, in order to be entitled to substantial weight such opinion must represent more than a conclusory statement, and must be supported by clinical or diagnostic findings. Kirk v. Secretary of Health and Human Services, 667 F.2d 524, 538 (6th Cir. 1981). Absent such supporting medical documentation, or an explanation of the nexus between the physical findings and the conclusion of disability where that relationship is not patent, the fact-finder may disregard the treating physician's opinion. Landsaw v. Secretary of Health and Human Services, 803 F.2d 211, 212 (6th Cir. 1986).

Under date of November 24, 2006 Dr. Reed completed a Basic Medical Form for the Ohio Department of Job and Medical Services. The capabilities and limitations he checked off therein are supportive of the plaintiff's claims of disability. However, this one piece of evidence cannot be viewed in a vacuum.

A patient note entered by Dr. Reed on the same date referring to the plaintiff's shortness of breath reads, in part, "Limitation on activities—moderately limits activities." That same degree of limitation appears in a patient note entered six months earlier. In 2003 Dr. Reed declined to offer an opinion as to the plaintiff's ability to work. While in a teledictation report dated February 2, 2003 he stated that "So even sedentary activities, she gets short of breath" he continued "and I guess you will have to make the determination as to whether she qualifies for disability." In a follow up report seven months later he stated:

> As far as my assessment of her ability to do functionally related problems, in my opinion, the patient could sit, stand, walk, handle objects, see, hear speak and travel. She would not be able to lift or carry for sustained periods or heavy exertion.

11

\* \* \*

> She has been a steroid-requiring asthmatic for a couple of years; rarely is controlled when I see her. I have referred her to specialists as I may have noted in previous dictations and those doctors would also be appropriate to decide disability.

The specialists to whom the plaintiff was referred by Dr. Reed were Dr. Robert Hines and Dr. Harish Kakarala.

Dr. Hines' records reflect that in January 2003 he declined to provide the plaintiff with a statement that she was disabled.

Patient notes entered by Dr. Kakarala under date of March 16, 2005 and June 8, 2005 read:

> **HPI:** The patient returns today without any significant complaints. She has been using her Advair as well as her p.r.n. albuterol. She states she does not use her p.r.n. albuterol very much. She does not use her Atrovent almost at all because she does not feel it works. I spoke with her regarding changing this to Spiriva 1 puff q.d. to which she agreed. She has been using her oxygen "most of the time," though she does use it on a p.r.n. basis essentially. She still is smoking 3-4 cigarettes a day which I scolded her for doing. She knows not to smoke when she is on oxygen. She also was told to stop smoking as soon as possible and the importance of this was strongly emphasized to her. She understands the importance of this. She was supposed to have a 6-minute walk which she did not get. I also discussed with her bout her most recent pulmonary function tests which seem to reveal emphysema rather than asthma. She states that her father had "emphysema" in his 40s as well. She also has a sister with "asthma." Therefore, I believe she should have an alph1-antitripsin level checked. She is still on prednisone 10 mg. q.d. which I will attempt to taper over the next few months (see chart for details).

\* \* \*

> **HPI:** The patient has no complaints at this time. She attempted to use Spiriva, but did not like it and felt that it was far inferior to Atrovent and Advair. Therefore, she is back on Advair, Atrovent, and p.r.n. albuterol. She did not get her 6-minute walk

12

>as instructed which is what she would have needed to be taken off oxygen at night. She has no other complaints at this time.

Finally, a patient note entered by Dr. Reed under date of October 3, 1998, when the plaintiff was employed and three and a half years before her claimed onset date, states that the plaintiff's "known medical diagnosis include primarily asthma, steroid-dependent. She has been hospitalized multiple times for that."

While plaintiff points to a pulmonary study performed during a hospitalization in late 2003 as supporting her claim of severe respiratory limitations, other studies performed before and after that study did not reflect the same extreme degree of restriction of pulmonary function. The ALJ found those test results to be more reliable than those from 2003.

Based upon this evidence, which was taken into consideration by the ALJ in his determination of the plaintiff's residual functional capacity, this Court cannot find that the ALJ's discounting of Dr. Reed's opinion violated the treating physician rule.

Plaintiff's fourth and fifth claims of error will be considered together, as they each pertain to the vocational expert's testimony and, in this Court's opinion, both turn upon the same consideration.

The fourth claim challenges the accuracy of the hypothetical question the ALJ put to the vocational expert, while the fifth assumes that the expert's response to a question posed by plaintiff's counsel should have been credited by the ALJ. The problem with both is that they rest on the premise that the plaintiff's subjective testimony as to her impairments, in particular the nature/frequency of her use of a nebulizer, was credible and should have been accepted by the ALJ. The ALJ, however, did not find that testimony credible and did not accept it.

Having considered the ALJ's stated basis for his credibility determination this Court finds

that it was clearly within his discretion as finder of the facts. As the hypothetical question propounded by the ALJ postulated capabilities/limitations consistent with those he found existed, rather than those plaintiff's counsel wished he would have found, it follows that there was no error in the ALJ's reliance on the vocational expert's testimony in response thereto.

It is, accordingly, recommended that final judgment be entered in the defendant's favor.


s/DAVID S. PERELMAN
United States Magistrate Judge


DATE:   November 4, 2008


**OBJECTIONS**

Any objections to this Report and Recommended Decision must be filed with the Clerk of Courts within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See, United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See, also, Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).